Caruthers, J.,
delivered the opinion of the Court.
The complainant claims title to a tract of land by descent from her mother, Rebecca Burkey, of which the defendant Claiborn is now in possession and claims title, and this bill is filed to remove the cloud, establish her right, obtain possession, and have an account of rents.
Thomas Self, Sr., the father of Claiborn and Rebecca, on the 30th November, 1844, executed and delivered to his then minor daughter, Rebecca, a deed of gift for the tract of land on which he then lived, of one hundred and thirty-one acres, the same now in dispute. On the same day she executed a penal bond, conditioned to keep and *123 secure her father and mother in the possession and use of the dwelling-house, and a designated part of the land, during their lives. The said Rebecca afterwards married John Burkey, and of this marriage complainant was the only issue. Soon after this marriage, John Burkey and wife, by agreement with Thomas Self, Sr., moved into a part of the same house, and took possession of the land. They continued to so live together until the death of Rebecca, in 1847, when, upon some difficulty between them, Burkey left the premises, and, soon after, this suit was instituted.
On the same day the deed of gift’ to Rebecca was executed, the old man made deeds to his son Thomas, and his daughter Mrs. Harmon, for other tracts of land.
After the death of Rebecca in 1847, Thomas Self, the grandfather, was appointed guardian of the complainant, with Claiborn and Thomas Self, Jr., his sons, sureties in his bond. On that occasion, or not long after, when an application was made to remove him by the father, he stated to the Court that “there was property in his hands belonging to the child to the value of $700 or $750; that the property had come through him, and he thought himself as capable of managing it as any one else.” The guardian bond is in the penal sum of $1500. In his guardian report of 5th June, 1848, he set forth as the property of his ward, that had come to his hands, only “thirty-five bushels of corn and thirty dozen oatsnothing is said about the land. There appears to be no other property but the land to make the estate worth $700, and this irresistibly proves that he then considered the land to belong to his ward.
The first ground of defence is, that this deed was *124 fraudulent, as it was made to defeat creditors. It appears that there was, at the time, a suit pending in equity against the donor, by a man by the name of McDaniel, his son-in-law, endeavoring to set up a resulting trust in a tract of land on which he, McDaniel, lived, and that he also owed some small debts. That suit afterwards failed, and there can be no complaint from that quarter. If there had been a recovery in that ease, and this conveyance had been in the way of its execution, a very different question would have been presented. How far the fact of indebtedness of a donor, at the time of making a voluntary conveyance, goes to invalidate it, is a question upon which there has been much controversy, and great conflict of judicial opinion. 1 Story Eq., §§ 362-365. But we consider the weight of authority and reason to be, that indebtedness which bears an inconsiderable proportion in amount to the property reserved, does not, of itself, render a voluntary conveyance void. If the property retained be entirely ample to pay all demands, the gift is good. It cannot be presumed in such a case, from the fact of indebtedness alone, that the object was to defeat creditors of their just demands. In this case, the proof is clear that the means of the donor were ample, beyond all question or contingency, to pay his debts, and so continued to the time of his death. Indeed, the payment of the debts he owed would have made but little impression upon his remaining estate, and no existing or subsequent creditor ever manifested uneasiness or made any complaint about the matter, until his son Claiborn became such, by buying up a few small debts.
Secondly, the defendant Claiborn sets up and relies upon a title derived from a sale of the same land, under *125 an execution issued in Ms favor against Ms father, on a judgment for debts due before the date of this voluntary deed. This defence -would seem to fall- under the decision of the point before discussed, because, if a good title passed by the deed as against creditors, a sale made by them could not affect it. But this whole proceeding on the part of the defendants was set on foot and carried out to cheat this infant out of her rights. The old man was made rather the unwilling instrument, in the hands of his son Claiborn, to accomplish this object. There is reason to believe that it was not his purpose ultimately to deprive his granddaughter and ward of the land, but he had imbibed a dislike to her father, and, to defeat him of any benefit he might have under the law, was willing to cooperate in a plan by which this injury would result to the child, and place himself and her, in relation to this property, in the power of his son — who seems to hold on to his advantages — and deprive his unprotected niece of her only means of support. But the law will protect her against this unnatural conspiracy to defraud her of her rights.
But let us examine for a moment the origin and character of this opposing title of Claiborn Self. The old man was induced to believe that Burkey would turn him and the old lady out of possession, upon his claim as tenant by the courtesy, though no purpose of that kind is proved, and doubtless none ever existed. Counsel was taken by Claiborn as to the mode of defeating the title of complainant, and the scheme adopted was to bring up some small debts which existed against the old man at the date of his deed of gift, upon which, together with some old claims purporting to be due to himself, *126 he brought suit, and recovered a judgment by default, at the first term, for between four and five hundred dollars. Under an execution on this judgment, the land was sold, and bought by the plaintiff Claiborn, at about one thousand dollars. The old man said, after all this, that they had defeated Burkey, but the child should have the land: that his money had bought it, etc. In his will, made after all this, and shortly before his death, there is this remarkable clause: “It is my desire that she” (his wife) “keep in possession of the farm where we now live” (the same in dispute) “during life, and to have the bond I hold on Olaiborn Self during her life for her support, to be collected for her annually by my executor.” The nature of this bond is not explained, but the circumstances strongly indicate that it had some connection with the inception of Claiborn’s title to the land, and may have been the bonus for the betrayal of trust on the part of the guardian. But this circumstance is not needed to satisfy the mind that this whole contrivance was unblushingly fraudulent, and can therefore afford no obstacle to the establishment of the complainant’s title. The judgment was permitted to go without defence; the personal property of the old man was, for the time, transferred, so as to enable the officer to return, “ no goods,” etc.; and, in addition to this, there were other tracts of land unencumbered upon which the levy could have been made. It is indeed made too plain for controversy by the proof, that this whole proceeding, from its commencement to the end, was a deliberate and fraudulent contrivance to defeat the title of Burkey and his infant daughter to this land, and secure it to defendant Claiborn. We do not then regard this defence *127 at all in tibe 'way of tlie relief prayed for in the bill. It would be most iniquitous to allow it to have that effect.
Thirdly. But it is contended that even if all this be so, yet the complainant can have no standing in Court, because, if she has any right, it is in remainder, and cannot take effect until the death of her father, who is tenant by the courtesy, and therefore the bill should have been dismissed upon the demurrer. We are inclined to think a bill may be maintained by a remainder-man to remove a cloud from the title; otherwise, a good right might be lost by delay, from the death of witnesses, etc. But let that be as it may, we consider that the infant has a perfect right to the land, upon the ground that her father would be estopped from the assertion of any right against her by his own statements in this bill as her next friend.
The decree of the Chancellor, dismissing the bill, will be reversed, and a decree made here declaring the deed to Claiborn void as against the title of complainant, and that she have an account of the rents and profits; for which, and such other orders as may be necessary, the cause will be remanded. The whole cost will be paid by defendant Claiborn Self.